UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

YANIRA SUAREZ,                                    :

                    Plaintiff,                    :    REPORT AND RECOMMENDATION

          -against-                               :
                                                       13 Civ. 5236 (LTS) (GWG)
CAROLYN W. COLVIN                                 :
Acting Commissioner of Social Security,
                                                  :
                    Defendant.                    :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

    Plaintiff Yanira Suarez brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income ("SSI") under the Social Security Act.  Both Suarez and the Commissioner have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons stated below, the Commissioner's motion should be denied.  Suarez's motion should be granted in part and denied in part, and this case should be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

I. BACKGROUND

    A.  Suarez's Claim for Benefits and Procedural History

    Suarez applied for disability and Supplemental Security Income ("SSI") benefits on November 17, 2006, see Administrative Record, filed December 19, 2013 (Docket # 9) ("R"), at 87-134, though she now seeks only SSI benefits, R. 644; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated March 28, 2014 (Docket # 14) ("Pl.

1

Mem."), at 4 n.1.  In the portion of the application asking Suarez to list her "illnesses, injuries, or conditions that limit [her] ability to work," Suarez wrote the following: "chronic asthma, seizures, back pain, severe allergies, right & left maniscal [sic] tear surgery, heart murmur, muscle disorder, bladder surgery[.]  I fall all the time due to my right and left knee buckle up on me.  I can not walk no more than a block[.]  If I walk more than a block I will fall [] because of my different medical condition[s.].  I can not [do] any type of work."  R. 105.  Suarez most recently worked as a sanitation worker in the New York University hospital kitchen from 1990 until 1995.  R. 106.

On June 14, 2007, the Commissioner denied Suarez's application for disability and SSI benefits.  R. 43-58.  Suarez requested a hearing before an Administrative Law Judge ("ALJ").  R. 61-63.  A hearing before an ALJ was held on June 2, 2009.  R. 18-37.  On July 31, 2009, the ALJ issued a decision finding that Suarez was not disabled.  R. 9-17.  On November 25, 2009, the Appeals Council denied Suarez's request for review.  R. 816-18.  Suarez thereafter filed a civil action in the United States District Court for the Southern District of New York and, by a stipulation and order dated October 12, 2010, the case was remanded to the Commissioner for further administrative proceedings.  R. 819-21.

On remand, the Appeals Council assigned the case to an ALJ for further proceedings.  R. 822-24.  Hearings were held before a new ALJ on November 17, 2011; July 2, 2012; and August 1, 2012.  R. 750-803; 714-49; 623-713.  On January 9, 2013, the ALJ issued a decision finding that Suarez was not disabled.  R. 591-612.  On May 30, 2013, the Appeals Council concluded that Suarez had not timely filed exceptions to the ALJ's decision, and had not timely sought an extension of time in which to do so.  R. 582-84.  As a result, the ALJ's decision became the final decision of the Commissioner.  R. 582.

2

On July 26, 2013, Suarez filed this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).

See Complaint, filed July 26, 2013 (Docket # 2).  Both Suarez and the Commissioner thereafter

moved for judgment on the pleadings.[1]

### B.    The Administrative Record

Suarez and the Commissioner have each provided a summary of the relevant evidence

contained in the administrative record.  See Pl. Mem. at 2-32; Comm'r Mem. at 2-20.  The Court

adopts the parties' summaries, which do not conflict in any material ways, as accurate and

complete for purposes of the issues raised in this suit.  We discuss the portions of the medical

record pertinent to the adjudication of this case in section III below.

### C.   Hearings Before the ALJ

After remand from the Appeals Council, Suarez appeared at three hearings with an

attorney.  As the transcript of the hearings before the ALJ is lengthy, we omit from this summary

portions that are not relevant to the issues raised in this case.

Suarez and her attorney appeared before the ALJ for a hearing on November 17, 2011.

R. 750.  Suarez was 37 years old at the time of the hearing.  R. 756.  She testified that she cannot

work because she has "severe pains and a lot of depression because of it."  R. 758.  She first had

surgery in June 2003 on her right knee for a torn meniscus.  R. 759.  She had trouble walking as

of spring 2005 and also experienced "buckling."  R. 766.  She had surgery to repair the anterior

cruciate ligament ("ACL") of the left knee in 2005.  R. 761.  She had ACL repair surgery on the

---

[1]  See Notice of Cross-Motion, filed March 28, 2014 (Docket # 13); Pl. Mem.; Notice of Motion, filed June 4, 2014 (Docket # 20); Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Motion for Judgment on the Pleadings, dated June 4, 2014 (Docket # 21) ("Comm'r Mem."); Plaintiff's Reply Memorandum, dated June 19, 2014 (Docket # 22) ("Pl. Reply").

right knee in October 2010.  R. 766.  She attributed the injury to the left knee to her having to

bear extra weight on it as a result of her right knee problems.  R. 761.  At the time of the hearing,

her knees were "very painful" and "burning."  R. 767.  She was wearing two titanium knee

braces at the hearing, which she said she wore on a daily basis, only taking them off to go to bed

and to shower.  Id.  She said her daughter helps her in and out of the tub and that she uses a chair

when bathing because she previously had slipped in the tub.  Id.

Suarez also testified to having pain in her lower back that is "excruciating" when she

stands or sits for "long periods of time," with the pain radiating down her left leg causing

numbness and tingling.  R. 768.  She sees a neurologist due to "blacking out" episodes caused by

back pain.  R. 769.  Her back problems started in January 2011.  R. 779.  The ALJ asked when

she began having problems sitting, and she responded, "I noticed it maybe after my first surgery

in 2003."  Id.  According to Suarez, difficulties with sitting began because she had to extend her

right knee and "throw the leg around" rather than bend it due to a limited range of motion.

R. 779-80.  The ALJ asked if she could "do a job sitting down," and Suarez responded that she

could not because she can "sit for no more than 10 or 15 minutes."  R. 780.  She added that she

also had bladder repair surgery and urinary incontinence.  R. 782.  The ALJ asked for

elaboration on her problems with sitting, and Suarez responded that the problems began in 2003

due to her back and knee pain.  R. 780.  Suarez then testified to only being able to sit for about

10 minutes before she gets uncomfortable.  R. 784.  She only began receiving treatment for the

back pain in 2011.  R. 781.  The incontinence began in 2000 after Suarez had a caesarean

section.  R. 782.  Suarez discussed her use of a cane and knee braces.  R. 786.  She said she uses

a cane all the time but uses a walker at home.  Id.  Suarez began seeing a therapist for psychiatric

issues in 2007, but she did not recall who the therapist was.  R. 790.  When asked to describe her

4

"psychological state," Suarez said she is very depressed, very anxious, and very angry.   R. 791.

Suarez briefly discussed her activities of daily living.  R. 793.  She testified that on an average day, she does not leave the house and only leaves for appointments.  Id.  She said her daughter stays home with her to take care of her baby, and that she socializes with the baby, reads, and "research[es]."  Id.  She does not watch television, but tries to "associate with the baby" as much as possible, but "then it becomes difficult."  Id.  Suarez said she does not do any household chores and that her children do them all.  Id.  The ALJ noted that there were no residual functional capacity assessments in the record from treating physicians, and that he was going to send Suarez for an orthopaedic examination.  R. 794-95.

Suarez and her attorney appeared for a second hearing on July 2, 2012.  R. 716.  At the outset of the hearing, the ALJ noted that a medical expert was supposed to be present but due to certain technical issues, the medical expert was not available.  Id.  The ALJ stated that he still wanted to receive testimony from Suarez despite the unavailability of the medical expert.  Id. The ALJ described a "simple desk job" as an order clerk in a hotel and asked Suarez if she could perform such a job.  R. 722-23.  Suarez responded that she could not because "it would involve sitting" and she "can't sit for long amounts of time" and has to "stand and sit."  R. 723.  She also stated that she has "severe . . . lower back pain" and "knee pains" which prevent her from sitting or standing for long amounts of time such that she could not carry her three-year-old child.  R. 726.  The ALJ asked Suarez how long she can sit for, and Suarez appeared to say that she needs to stand every 10 to 12 minutes.  R. 728.

The ALJ then asked Suarez some questions related to her psychiatric impairments.  He asked if she reads, and she said she reads "[w]hatever [she is] interested in at that moment" which usually consists of news sources like the Post, which she has delivered to her home.  R.

5

736-37.  She testified to having a computer but stated she generally does not use it.  R. 737.  She testified that she slept most of the preceding Saturday and Sunday due to medication side effects.  R. 740.  Her attorney pointed out that she had a cane with her, and she responded that it was prescribed by a doctor and that she uses if on a daily basis.  R. 743.  She said she was "supposed to only use it outdoors" but uses it at home also because "the walker is inconvenient."  R. 744.  Her attorney asked her if she could perform a job where she could sit and stand whenever she wanted for eight hours a day, five days a week.  R. 747.  Suarez responded that she could not, because "[s]itting and standing hurts a lot."  R. 748.  She also testified to needing to take naps from the medication she takes.  Id.  She added that she does not shop, and that her daughter does the household shopping.  Id.

Suarez and her attorney appeared before the ALJ again on August 1, 2012.  R. 624.  A medical expert appeared by telephone and a vocational expert was also present, though it is not clear if he was physically present or appearing by telephone.  R. 625.  Suarez testified to having pain in both her knees for "over a decade" as well as "instability, constant buckling" and stumbling.  R. 630.  She also said she has pain "shooting up" her back "because of the lower extremity pains."  Id.  Suarez testified that she cannot stand for long amounts of time, and can do so for about 20 to 25 minutes.  Id.  She said she can sit for an equal amount of time because she gets "shooting pain" in her back and her "fat pad area."  Id.  As for walking, Suarez testified that she is limiting to walking two and a half blocks without stopping and resting.  R. 631.  She said that she walks with a cane.  Id.

Suarez also discussed having ACL surgery twice in the past, with the last surgery occurring on October 14, 2010.  Id.  She said she still has buckling and stumbles despite the surgery and six months of therapy.  R. 632, 634.  She still has the "same amount of pain" so the

6

surgery was a "failure."  R. 632-33.  Suarez appeared at the hearing with a cane which she said

was prescribed by a doctor, and she also wore a titanium brace on her right leg which she

testified to wearing at all times.  R. 637-38.  She has a titanium brace for her left leg but she does

not wear it because she gets sores from the rubbing together of the braces.  Id.

  Dr. Ronald E. Kendrick, a medical expert, then testified.  R. 640.  Dr. Kendrick is a board

certified orthopaedic surgeon.  Id.  He had never met or examined Suarez before.  Id.  His

testimony was based upon having reviewed the medical records in the case.  Id.  Although Dr.

Kendrick expressed skepticism as to Suarez's testimony that she first injured her knee by falling

without a precipitating factor, R. 645-46, he agreed that the record indicates bilateral ACL tears

in both knees, R. 647.  Dr. Kendrick also noted that Suarez has several other conditions,

including asthma, depression, anxiety, and a lumbar condition.  R. 647-49.  His testimony was

limited to matters concerning her physical impairments, however.  R. 649.  Dr. Kendrick

testified that Suarez did not "meet or equal a listing."  Id.  The ALJ asked if "somebody in this

condition" could perform sedentary work.  Id.  He described sedentary work as requiring

walking or standing up to one-third of the time in an eight-hour day and never having to carry

more than ten pounds.  Id.  Also, such carrying would be occasional, meaning up to one-third of

the time in an eight-hour day.  Id.  The ALJ added that the job would have two 10 to 15 minute

breaks in the morning as well as a half hour to an hour break for lunch.  R. 649-50.  Dr. Kendrick

testified that "based upon this record" Suarez could perform sedentary work.  R. 650.  The ALJ

then asked Dr. Kendrick to "give [him] an idea" of what Dr. Kendrick had seen in the record.  Id.

Dr. Kendrick noted a history of knee buckling, but he did not see any injury from falling

documented in the record.  R. 650-51.  He also noted that some knee examinations have "shown

fairly limited range of motion" but that an examination showing "20 degrees of hip motion and

10 degrees of knee motion" had to be discredited as inaccurate, since "[t]here's no way" a person like that could sit.  R. 651.  That is, "if the claimant's sitting in a chair in front of you . . . that examination doesn't make [any] sense."  Id.

Dr. Kendrick stated that the cause of the pain in Suarez's knees is probably osteoarthritis, but he did not see any objective tests verifying that.  R. 652.  He found no objective evidence of a meniscal tear in the record.  R. 655.  Suarez's attorney then pointed out that treatment notes from a Dr. Levy indicated a torn meniscus.  R. 655-56.  Dr. Levy had never assessed Suarez's functional capacity, but Suarez's attorney noted that a state agency physician who had examined Suarez said that she experienced pain that was "work preclusive."  R. 656-57.  The parties and the ALJ appeared to be referring to Dr. Corvalan, although the transcript spells his name as "Copeland."  R. 658.  The ALJ clarified for the record that this doctor examined Suarez but was not a treating physician.  Id.  The ALJ asked if there is "anything in the objective record which would . . . put significant limitations on the claimant's ability to sit" to which Dr. Kendrick responded in the negative.  R. 667.

The ALJ next heard testimony from Raymond Cestar, a vocational expert.  R. 675.  Cestar noted that Suarez has "no past relevant work."  R. 676.  The ALJ then asked if a person who is limited to "sedentary unskilled" work with Suarez's educational background could perform any jobs, and the vocational expert testified that such a hypothetical person, who would be a "younger" individual, "can be expected to make a vocational adjustment to unskilled work; order clerk."  Id.  He also said such a person could perform the jobs of "call-out operator" and "clerical worker."  R. 677.  The ALJ asked if any of those three jobs "have any more than occasional contact with supervisors, the public, or . . . coworkers," and Cestar responded that they only involve occasional interaction of this sort.  R. 679.  He added that the "order clerk"

8

position involves a different kind of contact, which he called "casual."  Id.

Cestar also responded to questions posed by Suarez's attorney.  He stated that the hypothetical person being discussed could still perform the jobs identified even if they could never climb stairs and/or would never be able to travel without a companion's assistance.  Id. He similarly stated that a person who was unable to "walk a block at a reasonable pace on rough or uneven surfaces" could also perform the jobs, as they are indoor jobs.  R. 681.  Suarez's attorney asked "what sort of walking" a person would need to do for the jobs identified by Cestar, and Cestar responded that "a certain amount of walking or standing is often necessary" for sedentary work.  Id.  He said that this would involve, for example, retrieving a file from a file cabinet.  R. 681-82.  Suarez's attorney then asked Cestar if it would affect the number of jobs available to assume that the individual posited in the hypothetical "was only able to sit for one hour at a time" meaning the person would "have to get up and move around" for five or ten minutes.  R. 684-86.  Cestar responded that the hypothetical person could perform the jobs he had identified.  R. 686.

The parties then discussed Suarez's urinary incontinence.  R. 688.  Her attorney asked Cestar if the need to urinate four times per hour would prevent her from performing the jobs identified earlier.  R. 691-92.  Cestar responded that the ability to perform that work would be "highly unlikely."  R. 692.  In response to another question from Suarez's attorney, he responded that there would be no work available for the same hypothetical person who would be "unable to sit for more than two hours in an eight-hour day."  Id.  Her attorney then posed hypotheticals to Cestar involving non-exertional limitations.  R. 693.  He asked about a person who had to miss three days of work or more per month, and Cestar responded that no work would be available. Id.  The attorney asked about a person who had "severe deficiencies of concentration,

9

persistence, and pace" who would be off-task more than 50 percent of the time, and the ALJ interjected that no work would be available. R. 693. Although it is not clear from the transcript, Cestar also appeared to testify that a person who "can't deal with supervisors" would not have any available work either. R. 696.

During a closing statement offered by Suarez's attorney, the attorney pointed out that the psychological consultative examinations performed in the past "found that she would have . . . significant difficulties functioning on a regular basis." R. 701. The ALJ then stated that "the last psych CE was five years ago" and that he was not "going to rely upon a five-year-old" examination. R. 702. The ALJ added that he was going to "order another one." Id. The ALJ advised Suarez on the record that if she did not show up for the psychiatric examination, he would "make a credibility finding against [her]" with respect to the psychiatric issues in her case. R. 710-11.

After the last hearing, the ALJ submitted interrogatories to Dr. Kendrick on August 3, 2012. R. 1127. Dr. Kendrick opined that Suarez's impairments, combined or separately, did not meet or equal any impairment described in the Listing of Impairments, including listing 1.02A and 1.04. R. 1129. As relevant here, he also opined that she could sit for one hour at a time without interruption and could sit for a total of six hours in an eight-hour work day. R. 1132. He also opined that she could stand and walk for 30 minutes at a time without interruption, and that she could stand for a total of two hours in an eight-hour work day. Id.

D.  The ALJ's Decision

On January 9, 2013, the ALJ issued a decision finding that Suarez was not disabled. R. 594-612. His findings were as follows:

Suarez has not engaged in substantial gainful activity since April 2, 1995. R. 597.

10

Suarez has the following "severe" impairments: anterior cruciate ligament tears in both knees that required surgery, lumbago, lumbar radiculopathy, carpal tunnel syndrome, urinary incontinence, asthma, and major depression.  Id.  Suarez "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Id.  The ALJ relied on Dr. Kendrick's hearing testimony and his reply to the written interrogatory in finding that Suarez's impairments did not meet listings 1.04 or 1.02A "because there was no evidence of ineffective ambulation or neurological deficit lasting 12 months."  Id.  While Suarez takes medication for asthma, this impairment does not meet listing 3.03, as Suarez had never been hospitalized for asthma.  Id.  As for Suarez's mental impairments, these do not meet or medically equal the criteria of listing 12.04, paragraph B, because Suarez's mental impairments do not cause at least two "marked" limitations or one "marked" limitations and "repeated" episodes of decompensation, each of extended duration.  R. 597-98.  Nor do her mental impairments meet paragraph C of listing 12.04 because she has never been hospitalized for any psychiatric condition, never required a supportive living arrangement, and her mental impairment has not interfered with her ability to take care of her activities of daily living.  R. 598.

Suarez "has the residual functional capacity to perform the full range of sedentary work" but "[d]ue to her history of depression, [she] is restricted to the performance of simple, repetitive, and routine tasks, that is, unskilled work" but "she is otherwise unrestricted."  R. 599.  Also "[d]ue to a history of asthma she should not be exposed to concentrated chemicals and pollutants."  Id.  In reaching this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Id.

11

The ALJ summarized the record evidence which he had relied upon in making his RFC determination, beginning with Suarez's physical impairments.  Id.  After summarizing Suarez's allegations concerning her physical impairments, the ALJ concluded that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  R. 600.  The ALJ also summarized treating records related to Suarez's allegations of knee pain, back pain, neck pain, and hand pain.  R. 600-06.  The ALJ concluded that the "evidence shows that the claimant retains the ability to do a full range of sedentary exertion."  R. 606.  He noted Dr. Kendrick's testimony that her "ability to sit would not be affected" by her knee problems.  Id.  While Dr. Corvalan "reported an assessment in February 2012 that is consistent with an inability to do sedentary exertion," the ALJ accorded this opinion "little weight" with respect to Suarez's "ability to stoop."  Id.  The ALJ also disagreed with Dr. Corvalan's opinion that Suarez "could only sit for two hours in a working day" and instead found that the "overall evidence is more consistent with the assessment of Dr. Kendrick."  Id.  The ALJ summarized evidence indicating that Suarez's "knee condition improved considerably after the ACL reconstruction of her right knee in October 2010."  R. 606-07.  As for Suarez's asthma, the ALJ found that "asthma would not affect [her] ability to do sedentary work."  R. 607.  He similarly found that with respect to her complaint of "blacking out," there is "little in the record to show that [her] blacking out incidents had persisted" and found that this "impairment also would not affect her ability to do sedentary exertion."  Id.  He also found that Suarez's "urinary incontinence would not significantly impact her ability to do sedentary work."  Id.

The ALJ then considered Suarez's mental impairments.  Id.  He noted that, despite a May

2004 referral for psychiatric services "at her request," there was no indication of "follow up until December 2007," when Suarez was seen by a social worker for complaints of depression allegedly present for one year.  R. 607-08.  Then in April 2008, Suarez came under the care of Dr. Yelena Makarov, a psychiatrist at Montefiore Hospital.  R. 608.  In June 2009, Makarov found moderate limitations in Suarez's ability to interact appropriately with others in the workplace and in her ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions, but only mild limitations in ability to understand, remember, and carry out simple instructions.  Id.  The ALJ found that "[t]his assessment is consistent with unskilled work."  Id.  Dr. Makarov reported no improvement in October 2011, and found marked limitations in her ability to understand, remember, and carry out instructions, and severe limitations in her ability to respond appropriately to supervision and to co-workers, in her ability to satisfy an employer's normal quality, production, and attendance standards, and in her ability to respond to customary work pressures.  Id.  She found marked limitations in Suarez's ability to perform simple tasks on a sustained basis, perform activities of daily living, and maintain social functioning, and found severe limitations in her ability to concentrate, persist, and pace herself such that she failed to complete tasks in a timely manner, was incapable of even low stress jobs, and would need to be absent from work more than three times per month.  Id.  In June 2012, Makarov opined that Suarez was "permanently disabled due to her psychiatric condition."  R. 608-09.  In July 2012, Dr. Makarov reported that Suarez exhibited symptoms of depression, anxiety, mood swings, irritability, and that she had panic attacks.  R. 609.  The ALJ "decline[d] to accord Dr. Makarov's opinions from 2011 and 2012 much weight" and found "instead, that her less restrictive assessment from 2009 is more in keeping with the evidence."  Id.

13

The ALJ also noted that he had scheduled a post-hearing psychiatric examination, but that Suarez chose not to attend.  R. 610.  The ALJ stated that this "detracts considerably from her credibility and from her allegations that her psychiatric problems are disabling."  Id.

The ALJ ultimately found that the record supports the conclusion that Suarez "has knee pain which would limit her capacity to stand and walk for long periods of time" but that the record "does not support [her] allegations that she is unable to perform unskilled, sedentary work."  Id.  The ALJ therefore found that Suarez could "do a full range of unskilled, sedentary exertion as long as she is not exposed to chemicals and pollutants."  Id.

The ALJ found that Suarez is unable to perform her past relevant work as a kitchen sanitation worker because, by her account, that job required her to walk and stand all day and to clean kitchens, sweep, mop, take out the garbage, and lift 50 pounds.  Id.  The ALJ concluded that considering Suarez's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform."  Id.  The ALJ noted that when a claimant "cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations," the Medical-Vocational Guidelines are "used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations."  R. 611.  In this case, the ALJ found that based on an RFC "for the full range of sedentary work" and considering Suarez's age, education, and work experience, a finding of "not disabled" was directed by Medical-Vocational Rule 201.24.  Id.  The ALJ also noted that the vocational expert testified that an individual of Suarez's age, education, and background who had the RFC for sedentary exertion and unskilled work could perform the jobs of "order clerk," "call operator," and "clerical worker."  Id.  As a result, the ALJ found that

14

Suarez had not been under a disability, as defined in the Social Security Act, from April 2, 1995, through the date of his written decision.  Id.

II.  APPLICABLE LAW

A.  Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127–28 (2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . ").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F.

Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).

The Second Circuit has characterized the substantial evidence standard as "a very deferential

standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec.

Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citation and

internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and

substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d

at 454 (citations and internal quotation marks omitted).

B.  Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

16

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . .," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  Brault, 683 F.3d at 445 (at step five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform"); accord McIntyre, 758 F.3d at 150 ("The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four . . . . At Step Five, the

17

burden shifts to the Commissioner to show there is other work that [the claimant] can perform.")
(citations, quotation marks, and some brackets omitted).

III.  DISCUSSION

Suarez seeks reversal of the ALJ's decision on the following grounds: (1) the "vocational
expert testimony does not reflect Ms. Suarez's functional limitations" and (2) the "ALJ placed
undue reliance on the testimony by Dr. Kendrick."  Pl. Mem. at 38-45.

A.  Vocational Expert Testimony

Suarez asserts that an "ALJ must pose hypothetical questions to the vocational expert
which reflect the full extent of the claimant's capabilities and impairments to provide a sound
basis for the expert's testimony."  Pl. Mem. at 38-39 (citations omitted); accord id. at 39
("Vocational testimony elicited by hypothetical questions that fail to relate with precision to the
physical and mental impairments of a claimant is not substantial evidence on which an ALJ may
base a decision.") (citation omitted).  Suarez articulates two specific ways in which the
hypothetical questions posed by the ALJ to the vocational expert failed to adequately incorporate
her functional limitations.  We consider each contention in turn.

1.  Suarez's Use of a Cane

Suarez argues that "there is no dispute that [Suarez] requires the use of a hand held cane
to perform all of her walking."  Pl. Mem. at 40.  She asserts that "[i]n light of the uniformity of
opinion that a cane is medically necessary to perform the standing and walking required of
sedentary work, the relevant question is whether the standing and walking demands of the jobs
identified by the vocational expert could be performed by an individual using one arm to carry
items and one arm to hold the cane."  Id.  Suarez continues that "we do not know the answer to
this question because . . . the ALJ failed to ask the vocational expert whether the jobs he

18

considered could be done by a person who needed to use a cane to perform all their walking" or, in other words, the "questions posed to the vocational expert failed to reflect the established functional limitations of record." Id. at 40-41.  In response, the Commissioner asserts that "plaintiff's counsel never raised this objection during the hearing despite having cross-examined the [vocational expert] extensively."  Comm'r Mem. at 39.  The Commissioner also argues that "[i]n any event, among the jobs identified by the [vocational expert] . . . was the clerical worker position, which requires only occasional lifting of light objects such as ledgers and files that can be carried with one arm . . . and the order clerk and call-out operator positions generally do not require carrying or lifting objects."  Id. (citations omitted).

Both Suarez and the Commissioner rely upon Social Security Ruling 96-9P, which provides, in relevant part:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday.  Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions . . . .
>
> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand.  For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to

19

make an adjustment to sedentary work that exists in significant numbers.  On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

1996 WL 374185, at *3, *7.  Suarez contends that this ruling "makes clear that the medically required use of a cane or other 'hand-held assistive device' can erode a claimant's occupational base so that an ALJ may not rely on the Grids alone in determining whether the claimant is 'disabled' for Social Security purposes."  Pl. Mem. at 40 (citations omitted).  The Commissioner notes that an individual who uses a hand-held assistive device in one hand "may" still be able to perform unskilled sedentary work.  See Comm'r Mem. at 39-40.

As the Second Circuit has noted, "[a]t Step Five [in the disability evaluation process], the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert."  McIntyre, 758 F.3d at 151.  An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion."  Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); accord De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984) (where the ALJ does not present "the full extent"of plaintiff's physical disabilities to the vocational expert, "the record provides no basis for drawing conclusions" about whether the plaintiff's limitations render her disabled); Rivera v. Colvin, 2014 WL 3732317, at *40 (S.D.N.Y. July 28, 2014) ("Provided that the characteristics described in the hypothetical question accurately reflect

the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics."); Pritchard v. Colvin, 2014 WL 3534987, at *10 (N.D.N.Y. July 17, 2014) ("If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability."); Sanchez v. Barnhart, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004) ("The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the VE's testimony.").

An ALJ certainly is "not required to incorporate restrictions into the RFC or pose a hypothetical to [a vocational expert] that [is] not supported by the record." Margotta v. Colvin, 2014 WL 2854623, at *13 (S.D.N.Y. June 23, 2014). Here, however, the Commissioner does not contest Suarez's assertion that she "requires the use of a hand held cane to perform all of her walking." Pl. Mem. at 40. Moreover, Suarez testified that she used a cane that was "prescribed by a doctor." See R. 637.

We begin our analysis of Suarez's argument by noting that the Commissioner cites no authority for the proposition that an attorney's failure to object to a hypothetical posed to a vocational expert waives the claimant's right to argue that the hypothetical was legally inadequate. Nor are we aware of any such rule. We therefore reject the Commissioner's implicit waiver argument. As to the merits, we conclude that the ALJ's hypothetical improperly omitted the use of Suarez's medically-prescribed cane.

As indicated in the ALJ's written decision, the ALJ relied upon the vocational expert's testimony that an individual with Suarez's "age, education and background" who had the

21

"residual functional capacity for sedentary exertion and unskilled work" could perform the jobs of order clerk, call operator, and clerical worker.  R. 611.  This hypothetical, however, omitted any reference to Suarez's use of a cane.  This omission was material because, as SSR 96-9P makes clear, the "occupational base for an individual who must use [a hand-held assistive] device for balance because of significant involvement of both lower extremities . . . may be significantly eroded."  1996 WL 374185, at *7.  Moreover, one consultative examiner specifically found that Suarez could not use her free hand to carry small objects.  R. 1078.  The vocational expert was never asked to opine at all on the availability of jobs for a person who uses a cane.  It was also improper to rely on the grids alone inasmuch as SSR 96-9P strongly favors consulting a vocational expert for such a person.  Accordingly, the ALJ's decision cannot stand due to the absence of evidence on this question.

2. <u>Simple, Routine, Repetitive Work</u>

Suarez relatedly contends that in his written decision, the ALJ "found that Ms. Suarez was restricted to performance of simple, repetitive and routine tasks and unskilled work" but that "these specific functional limitations caused by Ms. Suarez's psychiatric impairments were not posed to the vocational expert."  Pl. Mem. at 41.  Rather, the "expert was only asked to identify unskilled sedentary work."  <u>Id.</u>  Suarez acknowledges that the ALJ did ask the vocational expert if the three jobs the expert identified could be performed by an individual who could "not have more than occasional contact with supervisors, the public or co-workers" but asserts that "at no point did the ALJ ask the vocational expert to includ[e] in his consideration the fact that the individual would be limited to simple, routine, and repetitive tasks."  <u>Id.</u>  Furthermore, the jobs identified by the vocational expert (<u>i.e.</u>, food and beverage clerk, call-out operator, and clerical worker) are jobs with "demands . . . in excess of the limitation to performing simple, routine, and

22

repetitive tasks." <u>Id.</u>  The Commissioner agrees that the ALJ found Suarez was limited to "simple, repetitive and routine tasks."  <u>See</u> Comm'r Mem. at 37.  However, the Commissioner argues that Suarez incorrectly asserts that these limitations prevent her from performing the jobs identified by the vocational expert at the hearing.  <u>Id.</u> at 37-38.

  In light of the fact that this case is being remanded for the reasons stated in section III.A.1 above, it is unnecessary to parse this question further.  On remand, the ALJ should make inquiry of a vocational expert that includes the "simple, repetitive and routine tasks" limitation.

  B.  <u>ALJ's Reliance on the Testimony of Dr. Kendrick</u>

  Suarez contends that the "ALJ erred by giving controlling weight to Dr. Kendrick's opinion."  Pl. Mem. at 43.  In support, Suarez's memorandum of law cites to a page in the ALJ's decision in which the ALJ principally discussed Suarez's ACL problems and her history of buckling knees before noting Dr. Kendrick's testimony that Suarez's "ability to sit would not be affected" by these problems.  R. 606.  We thus construe this argument as raising whether the ALJ properly evaluated Dr. Kendrick's opinion with respect to his conclusion that Suarez did not have significant restrictions on her ability to sit.

  The regulations on what "weight" are to be given by medical opinions state that the Commissioner "evaluate[s] every medical opinion" received in a case, and considers a variety of factors in "deciding the weight [she] give[s] to any medical opinion."  20 C.F.R. § 416.927(c).  Generally, the Commissioner gives "more weight to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [ a claimant]."  <u>Id.</u> § (c)(1); <u>accord</u> <u>Camilo v. Comm'r of the Social Sec. Admin</u>, 2013 WL 5692435, at *19 (S.D.N.Y. Oct. 2, 2013).  Additionally, more weight is generally given to opinions from treating sources.  20 C.F.R. § 416.927(c)(2).

Thus, the regulations directed the ALJ to give the opinion of Dr. Kendrick less weight than that of Dr. Corvalan. But this does not mean that the ALJ erred in accepting Dr. Kendrick's conclusions. First, Dr. Corvalan was not a treating source but rather a consultant, and thus his opinion was not entitled to the highest level of deference. Second, Dr. Corvalan's assessment — contained on a form indicating that Suarez could only sit for two hours in a day — was inconsistent with Dr. Corvalan's own finding in the same report that Suarez had only "moderate" limitations in her ability to sit. R. 1078, 1075. It was also inconsistent with the findings of Dr. Sharon Revan, a consultative examiner who examined Suarez in March 2007. R. 394. Dr. Revan found that Suarez had only "mild" limitations for "prolonged physical activity such as standing or sitting due to her knee pain." R. 398. Additionally, the ALJ could properly accept Dr. Kendrick's statement that one of Dr. Corvalan's findings — that Suarez could flex her knee only 10 degrees — was inconsistent with her being able to sit at all, and thus was essentially impossible. R. 651. The ALJ's opinion also notes that in April 2007, Suarez reported to a psychiatric consultative examiner that she "mopped and swept compulsively . . . activities that are inconsistent with an inability to do sedentary exertion." R. 607; see R. 423. We thus do not conclude that the ALJ acted improperly in choosing not to accept Dr. Corvalan's finding that Suarez could sit for only two hours in a day and instead adopting Dr. Kendrick's opinion that she could do so for six hours in a day.

C. Remedy

Suarez argues that because there is "extensive delay and substantial evidence of disability" in this case, "reversal and remand solely for payment of benefits is appropriate." Pl. Mem. at 46. In the alternative, she seeks "remand for further administrative proceedings." Id. at 47.

24

A court can reverse and remand solely for the calculation of benefits when "substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits." Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996) (citation omitted); accord Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 2000) (reversal and award of benefits proper where "record[] provide[s] persuasive evidence of total disability that render[] any further proceedings pointless"); Karabinas v. Colvin, 2014 WL 1600455, at *13 (W.D.N.Y. April 21, 2014) ("Reversal without remand, although atypical, is appropriate where . . . there is 'persuasive proof of disability' in the record and further proceedings would be of no use.") (citation omitted). Thus, "delay alone is an insufficient basis on which to remand for benefits." Bush, 94 F.3d at 46 (citation omitted).  By contrast, where there are simply "gaps in the administrative record or the ALJ has applied an improper legal standard," remand "for further development of the evidence" is the appropriate course of action.  Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Because we do not find persuasive evidence of disability, a remand for the calculation of benefits is inappropriate.

IV.  CONCLUSION

For the foregoing reasons, the Commissioner's motion (Docket # 20) should be denied.  Suarez's motion (Docket # 13) should be granted in part and denied in part, and this case should be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of

25

this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Laura Taylor Swain at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Swain. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: October 1, 2014

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge